**This order is SIGNED.**





**Dated: March 30, 2017**

**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>MICHAEL LYNN ROBERTSON,<br><br>    Debtor. | Bankruptcy Case No. 14-20984<br>Chapter 7 |
| BANNER BANK, formerly doing business in Utah as AmericanWest Bank or Far West Bank,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL LYNN ROBERTSON,<br><br>    Defendant. | Hon. R. Kimball Mosier<br><br><br><br>Adversary Proceeding No. 14-2189 |

## MEMORANDUM DECISION

Defendant Michael Lynn Robertson borrowed money from certain predecessors in interest to Banner Bank (Plaintiff or Bank). When he defaulted, the Bank foreclosed on real property securing the loans and obtained a deficiency judgment against the Defendant in state court. After he filed bankruptcy, the Bank filed a complaint to except that deficiency judgment

from discharge pursuant to 11 U.S.C. § 523(a)(2)(B) and (a)(2)(A).[1] The parties filed cross-motions for summary judgment and motions to strike, which are the matters presently before the Court. After considering the relevant filings in this adversary proceeding, including the parties' motions and exhibits, after considering the parties' oral arguments, and after conducting an independent review of applicable law, the Court issues the following Memorandum Decision granting the Plaintiff's motion for summary judgment and denying the Defendant's motion for summary judgment.

## I. JURISDICTION

The Court's jurisdiction over this adversary proceeding is properly invoked pursuant to 28 U.S.C. § 1334 and § 157(b)(1). This matter is a core proceeding within the definition of 28 U.S.C. § 157(b)(2)(I), and the Court may enter a final order. Venue is appropriate under 28 U.S.C. § 1409.

## II. FACTUAL BACKGROUND

The Court finds that there is no genuine dispute as to the following facts.[2] The Defendant's relationship with the Plaintiff began in July 2006 when it was known as Far West Bank.[3] The Defendant had wanted to start a new business that would use electronic checks to process payments in the jewelry industry. Working with Jay Knight, the branch manager of the Bank's branch in Springville, Utah, the Defendant opened a business account under the name Instapolypay and applied for an Automated Clearing House (ACH) account so that he could

---

[1] All subsequent statutory references are to title 11 of the United States Code unless otherwise indicated.

[2] Some of these facts are the subject of the Plaintiff's motions to strike. As noted in section III.A, *infra*, granting or denying those motions would not change the Court's decision. Therefore, the Court includes these facts here to better flesh out the history between the parties.

[3] Far West Bank was subsequently acquired by AmericanWest Bank, which later merged with Banner Bank. Docket No. 53, Declaration of Wayne Wagstaff, ¶¶ 6-7.

process ACH payments. The Bank approved the application and began providing ACH services to the Defendant in August 2006 under the Instapolypay account.

That same month, the Defendant applied for a $230,000 commercial loan from the Bank. In connection with that application, he provided a personal financial statement on an SBA form and what he claimed to be his 2005 tax return to the Bank. The financial statement listed the Defendant's annual salary as $120,000.[4] The purported tax return listed his income for the 2005 taxable year as $117,394 and his adjusted gross income as $110,228. It also represented that the Defendant made $20,000 in estimated tax payments. The return further represented that the Defendant had signed it under penalty of perjury, declaring to the best of his knowledge and belief that it was true, correct, and complete.[5] The return the Defendant provided to the Bank, however, was not the return he had filed with the IRS for the 2005 taxable year. An IRS transcript for the Defendant's 2005 taxable year shows taxable income of $5,757, adjusted gross income of $25,357, and taxes paid of $0.

Based in part on the purported tax return, the Bank approved the application, and the Defendant signed a promissory note for $230,000 on August 21, 2006. The note was secured by a deed of trust encumbering real property in Springville, Utah. Shortly thereafter, in October 2006, the Defendant applied to augment the loan by an additional $270,000. The Bank also granted that application.

---

[4] The Defendant signed that financial statement, certifying that it was true and accurate and that he understood that false statements "may result in forfeiture of benefits and possible prosecution by the U.S. Attorney General."

[5] The Defendant has always prepared the joint tax returns for himself and his wife for the past ten years and has not engaged anyone else to do so. Docket No. 52, Plaintiff's Motion for Summary Judgment Against the Debtor Michael L. Robertson on Claims Under 11 U.S.C. § 523(a)(2)(A) and (B) and Supporting Memorandum, Ex. A, Defendant's Deposition, at 12:7-25, 18:4-6.

In August 2007, the Defendant applied for an additional loan of $250,000 from the Bank. In connection with the loan application, the Defendant provided a new personal financial statement and what he held out as his 2006 tax return to the Bank. The financial statement represented that the Defendant's net income was $120,000.[6] The purported 2006 tax return, again asserting that the Defendant had signed it under penalty of perjury, represented that the Defendant's income for the 2006 taxable year was $118,847, that his adjusted gross income was $111,415, and that he had made an estimated tax payment of $20,000. As before, the 2006 tax return the Defendant provided to the Bank was not the return he had filed with the IRS. An IRS transcript for the Defendant's 2006 taxable year shows taxable income of $0, adjusted gross income of $16,711, and taxes paid of $0. Based in part on the purported tax return, the Bank also approved this application, and the Defendant signed a promissory note for $250,000 on September 12, 2007. The note was secured by a deed of trust encumbering the same real property in Springville, Utah as the deed of trust executed the year before.

Pursuant to the Defendant's ongoing credit relationship with the Bank, he provided what he claimed to be his 2007 tax return to the Bank. Like the prior years' tax returns, the purported 2007 return represented that the Defendant had signed it under penalty of perjury. It also represented that the Defendant's income for the 2007 taxable year was $134,008, his adjusted gross income was $126,168, and that he had made an estimated tax payment of $20,000. That return was not the one that the Defendant filed with the IRS. An IRS transcript for the Defendant's 2007 taxable year shows taxable income of $17,112, adjusted gross income of $17,112, and taxes paid of $0. The Defendant also provided additional personal financial statements to the Bank on December 4, 2007, September 4, 2008, and January 14, 2009, which

---

[6] The Defendant signed this financial statement, affirming that the information therein was "true, complete and correct."

4

represented that his salary was $150,000, $140,000, and $120,000, respectively. He signed the statements, certifying that they were true and accurate.

The two promissory notes matured and on April 23, 2009 they were consolidated into a single note in the principal amount of $669,726.32, which was secured by the two deeds of trust encumbering the Springville property. Subsequently, the Bank came into possession of a letter written by the Defendant to representatives of Utah Community Credit Union[7] and dated June 16, 2009. In that letter, the Defendant explains the discrepancies between tax returns he has filed with the IRS and returns he has submitted to lending institutions. The letter begins by telling a history of the Defendant's tax return preparation dating back over 25 years. The Defendant discovered that "as a business there were several very major and legal means to reduce the income we received for tax purposes."[8] But by taking substantial deductions, the Defendant ended up on the IRS's radar, "trigger[ing] an audit every year for a number of years."[9] In order to avoid the frustration and consumption of time caused by an audit, the Defendant decided to employ a vaguely-defined method of return preparation that, while still "in full compliance," would not lead to an audit each year.[10] While this had the intended result, it led to other problems. The returns prepared in this method showed that the Defendant was not making very much money. In addition, the returns prepared using the former method showed a similar lack of income due to business expense deductions. As a result, "[w]e were then unable to get any credit

---

[7] Utah Community Credit Union is another lending institution with which the Defendant did business. It is not related to the Plaintiff.

[8] Docket No. 52, Plaintiff's Motion for Summary Judgment Against the Debtor Michael L. Robertson on Claims Under 11 U.S.C. § 523(a)(2)(A) and (B) and Supporting Memorandum, Ex. U.

[9] *Id.*

[10] The letter states that "we decided that a better method would be for us to do the complete return and then take the final figures and submit those on a simple form. . . . [W]e can show the exact amounts we did bring in, the deductions allowed by law we take, and for what purpose, and we end up with the exact same figures in the net results." *Id.*

with local banks."[11] After trying in vain to convince banks that "we were indeed making money, but that it was used in ways that we could show a deduction instead of a profit," the Defendant created a new method of preparation for tax returns that would be submitted to lending institutions. That method shows basic deductions for normal expenses, but does not show "the other tax write offs that bring us down to the point where we show little income."[12] The Defendant admits in the letter that after he began employing that method he has not had difficulty obtaining credit from local banks.[13]

On September 22, 2010, the Bank sent the Defendant a letter informing him that the ACH agreement between it and Instapolypay would be terminated effective October 13, 2010. Thereafter, the Defendant defaulted on the consolidated note. The Bank foreclosed the trust deeds and sold the Springville property in June 2011 and commenced a deficiency action in Utah state court against the Defendant. The Defendant answered and asserted counterclaims for, among other things, breach of contract arising from the termination of the ACH agreement.[14] The parties filed cross-motions for summary judgment, and the court granted the Bank's motion on all of the Defendant's counterclaims and on all issues and claims with the exception that the court would conduct a trial to determine the balance owing under the consolidated note and the fair market value of the Springville property at the time of the foreclosure sale.[15] After trial, the court entered a money judgment in favor of the Bank and against the Defendant on September

---

[11] *Id.*

[12] *Id.*

[13] The Defendant obtained a $148,800 loan from Utah Community Credit Union on May 28, 2009 using this method. Utah Community Credit Union discovered that the tax returns the Defendant had submitted in connection with the application for that loan were not the ones he had filed with the IRS when Wells Fargo performed a spot audit on the application. At the time, Wells Fargo was considering buying the loan from Utah Community Credit Union. *Id.*, Ex. V.

[14] The other counterclaims included claims for negligence, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. *Id.*, Ex. T, ¶¶ 7-12.

[15] *Id.*, Ex. E, ¶ 16; Ex. T.

11, 2013. The court awarded judgment in the amount of $416,216.80 as of July 1, 2013 with post-judgment interest at the default contract rate of 21%, awarded attorneys' fees and costs and expenses, and provided that the judgment "shall be augmented by an award of reasonable attorneys' fees and costs incurred by [the Bank] in enforcing this Judgment pursuant to the terms of the loan documents made between the parties."

The following day the Defendant moved for a new trial, which the court denied. The Defendant then appealed the court's judgment to the Utah Court of Appeals, where the appeal is currently pending. The Defendant filed a voluntary petition under chapter 7 on February 3, 2014.

### III. DISCUSSION

#### A. The Parties' Motions to Strike

Before reaching the merits of the parties' cross-motions, the Court must briefly address four motions to strike. The Plaintiff filed three of the motions; they request that the Court strike or disregard (1) the Defendant's first declaration and certain related exhibits, (2) paragraphs 3-5 of the declaration of Jay Lynn Knight; and (3) portions of the Defendant's second declaration and certain related exhibits. The Defendant's motion seeks to strike the declaration of Wayne Wagstaff. All four motions have been thoroughly briefed.

The Court does not need to undertake a detailed analysis of the Plaintiff's motions to strike because even if the Court denied them and considered the declarations and exhibits in question, the Court's decision would remain unchanged. The declarations and exhibits that are the subjects of the Plaintiff's motions to strike do not raise genuine disputes as to any material fact so as to preclude entry of summary judgment in the Plaintiff's favor.

The Defendant's motion to strike argues that the declaration of Wayne Wagstaff should be stricken because the Plaintiff never disclosed Mr. Wagstaff as a witness under Rule 26, the

7

declaration is not admissible under the Federal Rules of Evidence, and Mr. Wagstaff lacks personal knowledge of the Bank's lending procedures.[16] The Plaintiff admits that Mr. Wagstaff wasn't disclosed initially, but asserts that that issue was resolved by stipulation last October. As regards the evidentiary objections, the Plaintiff addresses each specifically and asserts that none of them renders any portion of the declaration inadmissible. With respect to the issue of Mr. Wagstaff's personal knowledge, the Plaintiff argues that he was familiar with the Bank's practices and procedures that were in place while he was employed as well as those that were used not long prior to his employment because he oversaw the enforcement and workout of those loans, including the 2006 and 2007 loans at issue in this case.

The Court notes that the Defendant's motion to strike Mr. Wagstaff's declaration was filed on October 20, 2016, five days before the hearing at which the parties announced the stipulation regarding the initial disclosure of Mr. Wagstaff. The Court considers the part of the Defendant's motion that seeks to strike the declaration based on the Plaintiff's failure to disclose Mr. Wagstaff mooted by the stipulation. As for the Defendant's evidentiary objections to the declaration, the Court has examined all of the paragraphs as to which the Defendant has raised an objection, and the Court concludes that the objections thereto are all without merit. And on the issue of Mr. Wagstaff's personal knowledge, the fact that Mr. Wagstaff was not employed by the Bank when the 2006 and 2007 loans were made does not mean that he lacks personal knowledge of the Bank's practices applicable to those loans. More importantly, the Defendant does not dispute that the Bank, as a part of its routine loan application practices, requested the Defendant's tax returns. The Court will deny the Defendant's motion to strike.

---

[16] The declaration states that Mr. Wagstaff worked at the Bank from 2008 to 2013 and was employed as a vice president in the special assets division. The Defendant argues that since Mr. Wagstaff was not employed by the Bank when the 2006 and 2007 loans were made, he has no personal knowledge of the Bank's lending procedures during that time.

### B. Legal Standard Under Rule 56

Under Federal Rule of Civil Procedure 56(a), made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[18] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[19] In sum, the Court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[20]

The moving party bears the burden to show that it is entitled to summary judgment,[21] including the burden to properly support its summary judgment motion as required by Rule 56(c).[22] If the moving party has failed to meet its burden, "summary judgment must be denied," and the nonmoving party need not respond because "no defense to an insufficient showing is required."[23] Once the moving party meets its initial burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."[24] The nonmoving party may not rely solely on allegations in the pleadings, but must instead designate "specific facts showing

---

[17] Fed. R. Civ. P. 56(a).

[18] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[19] *Id.*

[20] *Id.* at 249.

[21] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[22] *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

[23] *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

[24] *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

that there is a genuine issue for trial."[25] The nonmoving party also "must do more than simply show that there is some metaphysical doubt as to the material facts."[26]

When considering a motion for summary judgment, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party,[27] but the Court does not weigh the evidence or make credibility determinations.[28] "On cross-motions for summary judgment, each motion must be considered independently."[29]

**C. Legal Standard Under § 523(a)(2)(B)**

Section 523(a)(2)(B) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

    (i) that is materially false;

    (ii) respecting the debtor's or an insider's financial condition;

    (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

    (iv) that the debtor caused to be made or published with intent to deceive."

To prevail on a claim under § 523(a)(2)(B), the creditor must prove each element by a preponderance of the evidence.[30] As the Tenth Circuit has recognized, "exceptions to discharge

---

[25] *Celotex*, 477 U.S. at 324.

[26] *Matsushida Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[27] *E.g.*, *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citation omitted).

[28] *Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).

[29] *Hofmann v. Drabner (In re Baldwin)*, 514 B.R. 646, 650 (Bankr. D. Utah 2014) (citing *Rajala v. U.S. Bank (In re Christenson)*, 483 B.R. 743, 746 (Bankr. D. Kan. 2012)).

[30] *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 673 (10th Cir. BAP 2005) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

10

are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[31]

In order for a statement to be "in writing," it must "have been written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor."[32] The Tenth Circuit has not addressed what constitutes material falsity, but other courts generally require "that the statement painted 'a substantially untruthful picture' of an entity's financial condition that objectively would, and subjectively did, affect a creditor's decision to pay money to a debtor."[33]

As for the next element, the Tenth Circuit has adopted the "strict interpretation" of the phrase "respecting the debtor's . . . financial condition"; written statements concerning the debtor's financial condition "are those that purport to present a picture of the debtor's overall financial health."[34] Statements that fall within this definition "include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities."[35] Tax returns also meet this definition.[36]

---

[31] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (citation omitted).

[32] *Id.* (quoting 4 *Collier on Bankruptcy*, ¶ 523.08[2][a] (15th ed. 1997)).

[33] *JD Invs. of Utah, LLC v. Hanson (In re Hanson)*, No. 12-2219, 2014 WL 2548100, at *6 (Bankr. D. Utah June 5, 2014) (collecting cases); *see also Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 782 (Bankr. E.D. Tenn. 2003) ("[A] statement is materially false if it contains an important or substantial untruth. The measuring stick of material falsity is whether the creditor would have made the loan if the debtor's true financial condition had been known.") (citation and internal quotation marks omitted).

[34] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005). The formerly-prevailing "broad interpretation" held that "statements respecting financial condition are those written statements concerning the condition or quality of a single asset or liability impacting on the debtor's financial picture." *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 614 (Bankr. D. Utah 2002) (citation and internal quotation marks omitted).

[35] *In re Joelson*, 427 F.3d at 714.

Reliance under § 523(a)(2)(B)(iii) must be actual reliance.[37] But actual reliance does not demand that the creditor rely exclusively on the false financial statement in question. "It is sufficient if the creditor establishes that it partially relied on the false statement."[38] Whether reliance is reasonable is measured by an objective standard.[39] It is a facts-and-circumstances inquiry in which "a bankruptcy court may consider, among other things, whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent [lender] to the possibility that the representations actually relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations."[40] In short, this "standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon [the] debtor's representations."[41] This is a more demanding standard than the justifiable reliance standard found in § 523(a)(2)(A).[42] A court

---

[36] *Renasant Bank v. Goodin (In re Goodin)*, No. 12-01115-JDW, 2016 WL 5874969, at *6 (Bankr. N.D. Miss. Oct. 7, 2016) ("[T]ax returns . . . are exactly the type of documents contemplated by [§ 523(a)(2)(B)]."); *Regions Bank v. Whisnant (In re Whisnant)*, 411 B.R. 559, 565 (Bankr. E.D. Tenn. 2009) ("[T]ax returns fall squarely within the scope of statements in writing respecting a debtor's financial condition contemplated by § 523(a)(2)(B)."); *Carson v. Chamberlain (In re Chamberlain)*, 330 B.R. 195, 203-04 (Bankr. S.D. Ohio 2005) (tax returns are sufficient for § 523(a)(2)(B)); *In re Copeland*, 291 B.R. at 783 ("Tax returns have also been considered financial documents for the purpose of [§ 523(a)(2)(B)].").
[37] *In re Cribbs*, 327 B.R. at 674.
[38] *Colorado E. Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550, 561 (Bankr. D. Colo. 2009) (citing *Cent. Nat'l Bank & Trust Co. v. Liming (In re Liming)*, 797 F.2d 895, 897-98 (10th Cir. 1986)).
[39] *Cyprus Credit Union v. Dehlin (In re Dehlin)*, No. 09-2176, 2011 WL 1261623, at *6 (Bankr. D. Utah Mar. 31, 2011).
[40] *In re Hanson*, 2014 WL 2548100, at *6 (citation and internal quotation marks omitted).
[41] *Leadership Bank, N.A. v. Watson (In re Watson)*, 958 F.2d 977, 978 (10th Cir. 1992) (citation and internal quotation marks omitted).
[42] *GDO Invs., Inc. v. Glasgow (In re Glasgow)*, 370 B.R. 362, 372 (Bankr. D. Colo. 2007).

"may not substitute its judgment for the business judgment of the creditor in deciding to make the loan."[43]

As for the final element, a debtor's intent to deceive will rarely exist in the form of direct evidence. Instead, "[i]ntent to deceive may be inferred from the totality of the circumstances, including a reckless disregard for the truth."[44] The requisite intent may also be inferred "when the other elements of § 523(a)(2)(B) have been met."[45] "A debtor's mere 'unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts.'"[46]

### D. The Defendant's Motion for Summary Judgment

The Defendant's motion does not attempt to show affirmative evidence negating an essential element of the Bank's claims or the absence of sufficient evidence to establish those claims, a common approach for defendants at summary judgment.[47] Instead, the Defendant argues that the complaint should be dismissed under the unclean hands doctrine. Stated briefly, the Defendant's position is that the Bank acted improperly and caused him to default on the consolidated note when it terminated the ACH agreement—which provided the income for him to service the debt with the Bank—and when it foreclosed the trust deeds in a manner allegedly inconsistent with Utah law. Since the Bank's actions were the direct cause of the default and the resulting judgment it seeks to except from discharge, the Defendant asserts that the Bank should not be able to obtain relief under § 523(a).

---

[43] *In re Watson*, 958 F.2d at 978.
[44] *In re Cribbs*, 327 B.R. at 673.
[45] *In re McCarthy*, 421 B.R. at 563 (citation omitted).
[46] *Id.* at 564 (quoting *In re Liming*, 797 F.2d at 897).
[47] *See Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) ("The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial.").

The unclean hands doctrine—also called the clean-hands doctrine—stands for the general "principle that a party cannot seek equitable relief or assert an equitable defense if that party has violated an equitable principle, such as good faith."[48] As applied specifically in exception to discharge proceedings, some courts have held that "[b]ecause bankruptcy courts are courts of equity, a plaintiff deemed to have unclean hands cannot obtain a judgment of nondischargeability."[49] At least one court, however, has expressed reservations about applying the unclean hands doctrine in § 523 proceedings, noting that a plaintiff's claim in such instances is based on statute, not equity.[50]

The Court does not need to decide whether the unclean hands doctrine applies in exception to discharge proceedings because the Bank does not have unclean hands. The scope of the unclean hands doctrine is limited; it "only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties, that is, when the tawdry acts in some measure affect the equitable relations between the parties in respect of something brought before the court."[51] The Defendant argues that the Bank's unclean hands are demonstrated by its

---

[48] *Clean-Hands Doctrine*, Black's Law Dictionary (8th ed. 2005); *see also Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[The unclean hands doctrine] is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").

[49] *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015) (citations omitted); *see also Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 810 (4th Cir. 2001) ("A plaintiff with unclean hands is not entitled to relief from a court of equity in the form of an order denying the dischargeability of a debt.").

[50] *See Bello Paradiso, LLC v. Hatch (In re Hatch)*, 465 B.R. 479, 494 (Bankr. W.D. Mich. 2012) ("[T]he court has qualms about applying the unclean hands doctrine in dischargeability litigation because the relief that a plaintiff requests under 11 U.S.C. § 523 is statutory, not simply equitable.").

[51] *Greene v. Mullarkey (In re Mullarkey)*, 410 B.R. 338, 354 (Bankr. D. Mass. 2009) (citation and internal quotation marks omitted); *see also Hopper v. Everett (In re Everett)*, 364 B.R. 711, 723 (Bankr. D. Ariz. 2007) ("A court may deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which

14

allegedly wrongful termination of the ACH agreement (and the events leading up to it) and its purportedly improper foreclosure sale of the Springville property. Based on these actions, the Defendant asserts that the Bank is liable for claims sounding in breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, promissory estoppel, and constructive fraud.

The problem for the Defendant is that the state court has already ruled on the propriety of the termination of the ACH agreement and the foreclosure sale. And that ruling was unequivocal: the Bank "fully complied with the termination terms of the ACH Agreement" and the "foreclosures of the Trust Deeds were lawfully conducted in compliance with the terms of the Trust Deeds and Utah law."[52] Accordingly, the state court concluded that the Defendant "does not have a claim for breach of contract arising from the foreclosure of the Trust Deeds, the cancellation of the ACH Agreement or any other loan document or Agreement."[53] Moreover, the state court held that the Bank "did not breach any implied covenant of good faith and fair dealing in connection with" the ACH agreement and trust deeds.[54]

Because the state court determined that the Bank properly terminated the ACH agreement and lawfully foreclosed the trust deeds, the doctrine of issue preclusion prevents the Defendant from arguing otherwise in this Court.[55] In addition, the doctrine of claim preclusion bars the Defendant from raising claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, promissory estoppel, and constructive fraud,

---

that party seeks relief.").
[52] Docket No. 52, Ex. T, at 3-4.
[53] *Id.* at 3.
[54] *Id.* at 4.
[55] *See Fowler v. Teynor*, 323 P.3d 594, 596 (Utah Ct. App. 2014) ("[I]ssue preclusion prevents the relitigation of facts and issues that have been previously determined."). The Court concludes that the elements of issue preclusion under Utah law are satisfied here.

claims that seek to challenge the propriety of the Bank's termination of the ACH agreement and the foreclosure sale.[56] Consequently, the Defendant cannot argue that the Bank engaged in misconduct with regard to those actions, and his argument asserting that the Bank has unclean hands fails. The Court will deny the Defendant's motion for summary judgment and will decline to dismiss the complaint.[57]

### E. The Plaintiff's Motion for Summary Judgment

At the outset, it is undisputed that the Bank loaned money to the Defendant. But the Defendant asserts that there is a genuine dispute over whether the Bank has a claim against him that can be excepted from discharge because the judgment entered against him in state court is on appeal. He argues that the judgment is invalid because the Bank improperly terminated the ACH agreement. For the reasons stated in section III.D, *supra*, the Court cannot revisit that judgment. As it currently stands, the judgment is valid and is entitled to full faith and credit. Therefore, the Court concludes that the Defendant owes a debt to the Bank based on that judgment.

---

[56] The Defendant raised the claims of breach of contract and breach of the implied covenant of good faith and fair dealing in the state court litigation, and the state court ruled on them. Although the Defendant did not raise the claims of fraudulent inducement, promissory estoppel, and constructive fraud in state court, they could have and should have been raised there since they arise from the same operative facts as the claims he did raise. *See Gillmor v. Family Link, LLC*, 284 P.3d 622, 626-27 (Utah 2012) (stating the elements of claim preclusion under Utah law). The Court concludes that the elements of claim preclusion are satisfied here. The Court also concludes that the doctrines of claim and issue preclusion apply to the state court judgment even though it is currently pending on appeal. *See Youren v. Tintic School Dist.*, 86 P.3d 771, 773 n.2 (Utah Ct. App. 2004) ("We recognize the split in Utah case law on the general issue of the finality of judgments pending appeal and conclude that the better approach is that taken by the more recent Utah cases, which hold that a rendered judgment is final for purposes of res judicata until reversed on appeal, modified by the rendering court, or set aside by the rendering court."). The state court judgment has not been reversed, modified, or set aside. Therefore, it is final for purposes of res judicata, and claim and issue preclusion apply to it.

[57] This case appears to present grounds for invoking the *Rooker-Feldman* doctrine as another basis to decline to revisit the state court's judgment. But "*Rooker-Feldman* applies only to suits filed after state proceedings are final." *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006). Because the state-court appeal remains unresolved, the *Rooker-Feldman* doctrine is inapplicable. *See D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1232 (10th Cir. 2013).

In addition, the first and third elements of § 523(a)(2)(B) are established easily. Because the Defendant prepared and signed the documents purporting to be tax returns that he submitted to the Bank, those returns qualify as statements "in writing." And as established by case law, tax returns are statements respecting a debtor's financial condition.

The remaining elements require more elaboration. Whether the purported tax returns the Defendant submitted to the Bank were materially false is the subject of significant contention. The Defendant admits that he provided the Bank with tax returns that were not the same as those he filed with the IRS, and he does not dispute that the income totals on the returns and personal financial statements given to the Bank are significantly larger than those on the returns filed with the IRS. Even so, he argues that the tax returns at issue in this case are not materially false because they reflected his true financial condition.

In support of this argument, the Defendant asserts that the income figures on the returns he submitted to the Bank are supported by Annual Charitable Cash Contributions Official Tax Summary Statements from The Church of Jesus Christ of Latter-day Saints (Church), which show the Defendant's contributions to the Church from 2005-08.[58] The Bank has objected to those statements on the grounds that they include hearsay and lack foundation. "At the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial. . . . Nonetheless, the content or substance of the evidence must be admissible."[59] Assuming, for the sake of argument, that the content of these statements could be admissible at trial if placed into the proper form, the Court will consider them here.

---

[58] *See* Docket No. 74, Ex. A.
[59] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citations and internal quotation marks omitted).

The 2005, 2006, 2007, and 2008 statements show charitable contributions of $16,801, $16,420, $15,482, and $17,505, respectively. The Defendant asserts that they show his annual tithing and thus represent 10% of his income. But the statements do not, by themselves, have any relationship to the Defendant's income and therefore cannot create a genuine dispute as to what the Defendant's income was during those years. At most, they establish only that the Defendant contributed certain amounts of money to the Church during 2005-08. That evidence is not sufficiently probative to preclude granting summary judgment to the Bank on the question of whether the tax returns were materially false.[60]

The Court concludes that the tax returns the Defendant submitted to the Bank were materially false for two reasons: They were not the ones he filed with the IRS and the income listed on the returns was significantly larger than that on the returns filed with the IRS. As for the first reason, the Defendant admitted to creating returns with higher listed incomes because banks refused to loan him money when he showed them the returns with lower listed incomes, *i.e.*, the ones filed with the IRS. Even when he explained the methodology behind the returns to the banks and assured them he was making money, they still would not approve the loan applications. In this case, the Bank requested the Defendant's tax returns as part of the loan application process. But the Defendant did not provide his tax returns; he only supplied documents that purported to be his tax returns. Because they were not the returns that he had filed with the IRS, they were not his tax returns by definition. Although the Defendant asserts that these purported returns reflected his true financial condition, the Court disagrees. A properly-completed tax return filed with the IRS should sufficiently reflect a debtor's true

---

[60] *See Anderson*, 477 U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [fact finder] to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

financial condition. Were it otherwise, lending institutions would not request IRS-filed tax returns in connection with loan applications, but rather the secondary returns like those the Defendant gave to the Bank. But this is not reality. The world imagined in the Defendant's argument—one in which entities keep two sets of returns, one for tax purposes, the other for lending purposes—borders on the absurd. The purported tax returns the Defendant provided to the Bank are materially false simply because they are not the ones he filed with the IRS and are therefore not his tax returns.

As for the second reason, loan application documents that represent that a debtor's income is substantially different from the debtor's income as stated in tax returns filed with taxing authorities constitute materially false statements.[61] In this case, the Defendant's purported 2005, 2006, and 2007 tax returns that he provided to the Bank overstated his taxable and adjusted gross income relative to the tax returns he filed with the IRS by an average of $115,793.33 and $95,877.00, respectively. Considering the amounts of the loans at issue and the asserted amounts of the Defendant's income, those figures represent a substantial difference in income. As a result, the purported returns and personal financial statements submitted to the Bank created a substantially untruthful picture of the Defendant's financial condition.

Accordingly, because banks in general would not loan money to the Defendant until he created the higher-income returns, and the Bank in particular would not have loaned money to him if he had provided it with the returns he filed with the IRS, the purported returns at issue in

---

[61] *See Fleming Cos. v. Eckert (In re Eckert)*, 221 B.R. 40, 44 (Bankr. S.D. Fla. 1998) ("[T]he financial statement was materially false because it greatly overstated Dr. Eckert's income. . . . This huge gap between the income tax returns and the income reflected on the financial statement constitutes a materially false statement."); *Frankford Bank v. Chryst (In re Chryst)*, 177 B.R. 486, 498-99 (Bankr. E.D. Pa. 1994) (concluding that personal financial statements that overstated the debtor's income relative to her income tax returns were materially false).

this case are materially false statements that objectively would, and subjectively did, affect the Bank's decision to make the loans to the Defendant.

On the issue of reliance, the Defendant argues that the Bank's reliance on the tax returns was not reasonable because it failed to perform a sufficient investigation. He notes that if the Bank had immediately requested that he sign a request to obtain transcripts of his tax returns, as it did later, the Bank could have discovered the discrepancy in income before making the loans. In response, the Bank argues that it was entitled to assume that the tax returns were those that the Defendant had filed with the IRS and that requesting transcripts from the IRS would be above and beyond its duty to investigate the Defendant's representations.

The Court agrees with the Bank. "Reasonable reliance was made an element in 11 U.S.C. § 523(a)(2)(B) to prevent unscrupulous creditors from inducing debtors to submit false statements so that they can be later used to object to the debtor's discharge."[62] It does not require lenders to "hire detectives before relying on borrowers' financial statements" or "view each representation with incredulity requiring verification."[63] Moreover, "[o]nce it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith."[64] In those instances, reasonableness is "a low hurdle for the creditor to meet."[65]

---

[62] *FDIC v. Reisman (In re Reisman)*, 149 B.R. 31, 39 (Bankr. S.D.N.Y. 1993).
[63] *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 170 (9th Cir. BAP 1999).
[64] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 305 (2d Cir. 1996) (citation and internal quotation marks omitted); *see also In re Gertsch*, 237 B.R. at 170 ("[W]hen there is evidence of materially fraudulent statements, little investigation is required for a creditor to have reasonably relied on the representations.").
[65] *In re Bonnanzio*, 91 F.3d at 305.

20

Here, the Court has determined that the purported tax returns the Defendant submitted to the Bank were materially false. Therefore, the Bank was not required to undertake a searching investigation in order for its reliance to be reasonable. Under the facts and circumstances of the case, the Court concludes that the Bank's reliance was reasonable. There were no red flags to alert the Bank that the income figures on the purported tax returns were erroneous. Instead, the income figures on a given year's return approximated the income and salary figures the Defendant provided on the personal financial statement for that same year. And each subsequent year of submitted tax returns and financial statements corroborated the one before it; the Defendant's asserted income remained relatively constant during the period in question. Reasonable lenders in these circumstances are not required to skeptically presume, without evidence, that borrowers' tax returns are not the same as those they filed with the IRS. To impose a requirement on lenders that they obtain tax return transcripts to check against borrowers' tax returns, as the Defendant suggests, would be to mandate that they view each representation with incredulity requiring verification when circumstances suggest no such verification is necessary.

The Court also concludes that the Bank's reliance was actual. The Bank has established that it relied, at least in part, on the information provided in the Defendant's purported tax returns in deciding whether to loan him money.[66] The purported tax returns offered crucial information on the Defendant's asserted cash flow and ability to make payments on the loans, which were essential to the Bank's evaluation of the loan applications.

---

[66] The Bank also asserts that it relied on the Defendant's personal financial statements in making the loans. The Court does not need to address the Bank's reliance on those statements, however, because it has determined that the Bank relied in part on the purported tax returns. That is sufficient to satisfy the reliance element of § 523(a)(2)(B). *See supra* note 38.

The Defendant's intent to deceive is inferred from his history of tax return preparation. After banks repeatedly refused to offer him loans when given the lower-income tax returns, the Defendant created tax returns that purported to show higher income in order to induce banks to make loans that they otherwise would not have made. These higher-income tax returns were successful in getting banks to loan him money, and they were the ones that the Defendant provided to the Bank in order to obtain the loans at issue. The Defendant's intent is clear: The higher-income returns were simply a means to an end. The Defendant knew that banks would not loan him money without the higher-income returns. So he showed the Bank the higher-income returns and withheld the lower-income returns, knowing, based on past experience, that the Bank would find the latter relevant and would likely turn him down if it saw those returns.[67] That is the very nature of deception.

Accordingly, based on the undisputed facts the Court finds that the Plaintiff has proved each of the elements of its claim under § 523(a)(2)(B) by a preponderance of the evidence and that it is entitled to judgment as a matter of law on that claim. Therefore, the Court does not need to address the Plaintiff's alternative claim for relief under § 523(a)(2)(A). As for the amount of the debt excepted from discharge—the Plaintiff had requested punitive damages in its complaint, but indicated at oral argument that it would be willing to withdraw that request if it were granted summary judgment excepting the state court judgment from the Defendant's discharge. Because the Plaintiff has prevailed on summary judgment, the Court considers the punitive damages request withdrawn. The Court will except the debt owing under the state court judgment, with interest according to the judgment's terms, from the Defendant's discharge. As required by the

---

[67] The Defendant emphasizes that he discussed the details of his personal financial statements with Jay Knight, particularly with regard to ownership of the property he listed thereon. Tellingly, however, he concedes that he did not discuss the issue of his income with Mr. Knight.

judgment, such amount shall be augmented by the Plaintiff's reasonable attorneys' fees and costs in enforcing the judgment, which the Plaintiff must prove by affidavit and to which the Defendant will have an opportunity to object.

## IV. CONCLUSION

The Defendant's claim that the Bank has unclean hands is precluded by the state court's summary judgment ruling. Accordingly, the Court will deny the Defendant's motion for summary judgment. The Bank has shown that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on its claim under § 523(a)(2)(B). The Court will therefore grant the Bank's motion for summary judgment on that claim. The Court will also deny the parties' motions to strike. A separate Order and Judgment will be issued in accordance with this Memorandum Decision.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

Steven W. Call                scall@rqn.com, docket@rqn.com, lconterio@rqn.com
Elaine A. Monson          emonson@rqn.com, docket@rqn.com, pbrown@rqn.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

Michael Lynn Robertson
544 N 880 E
Springville, UT 84663